No. 26-10993

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

## DAVID MORRIS CLAYMAN,

*Plaintiff–Appellant,*

v.

## SECRETARY, U.S. DEPARTMENT OF THE TREASURY, et al.,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:25-cv-80890-WM
(Hon. William Matthewman, Chief United States Magistrate Judge)

## APPELLANT'S OPENING BRIEF

David Morris Clayman
*Pro Se Plaintiff–Appellant*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252-9626
david@clayman.org | david@ingwetrust.org

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rules 26.1-1 through 26.1-3, Appellant certifies that the following listed persons

and entities have or may have an interest in the outcome of this case or appeal:

Bessent, Scott Kenneth Homer, Secretary of the U.S. Department of the Treasury (Defendant–Appellee, named solely in his official capacity as Secretary of the Treasury)

Blanche, Todd, Acting Attorney General of the United States (Defendant, in his official capacity; automatically substituted for Pamela Bondi pursuant to Fed. R. App. P. 43(c)(2))

Brown, Orice Williams, Acting Comptroller General of the United States (Defendant, in her official capacity; automatically substituted for Gene L. Dodaro pursuant to Fed. R. App. P. 43(c)(2))

Clayman, David Morris (Plaintiff–Appellant)

Congress of the United States (Defendant)

Curran, Sean M., Director of the United States Secret Service (Defendant, in his official capacity; automatically substituted for Ronald L. Rowe, Jr. pursuant to Fed. R. App. P. 43(c)(2))

Doty, George Espy, III, Assistant United States Attorney (counsel for Appellees)

Matthewman, Hon. William, Chief United States Magistrate Judge (trial judge)

Mullin, Markwayne, Secretary of the U.S. Department of Homeland Security (Defendant, in his official capacity; automatically substituted for Kristi Noem pursuant to Fed. R. App. P. 43(c)(2))

Petri, Steven, Assistant United States Attorney (appeared for Defendants in the district court)

Reding Quiñones, Jason A., United States Attorney (counsel for Appellees)

Romero, Kelsi R., Assistant United States Attorney (counsel for Appellees)

Thompson, Darcie Ahern-Sweet, Assistant United States Attorney (former counsel for Defendants in the district court)

Trump, Donald J., President of the United States (Defendant, named solely in his official capacity as President of the United States in the Third Amended Complaint)

United States of America (Defendant–Appellee)

Warsh, Kevin, Chairman of the Board of Governors of the Federal Reserve System (Defendant, in his official capacity; automatically substituted for Jerome H. Powell pursuant to Fed. R. App. P. 43(c)(2))

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

ii

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant respectfully requests oral argument. This appeal presents a question of first impression in this Circuit: whether the inscription of the Divine Name[1] on the Nation's exclusive legal tender substantially burdens, within the meaning of the Religious Freedom Restoration Act, the religious exercise of an observant Jewish adherent whose faith imposes affirmative custodial duties toward physical media bearing that Name. The appeal also presents recurring procedural questions concerning dismissal with prejudice by local-rule default against pro se litigants. Argument would materially assist the Court — and it would give this case what more than a year of district-court practice never did: in the entire life of this litigation, no court has heard argument on the merits of any motion. The sole proceeding below was a thirteen-minute status conference concerning consent to magistrate-judge jurisdiction. Doc. 28.

[1] Consistent with Appellant's sincerely held religious practice, the Divine Name is rendered in hyphenated or abbreviated form throughout this brief, including within quotations from authorities, statutes, and the record. No substantive alteration of any quoted source is intended, and the parties and the district court employed the same convention below. See, e.g., Doc. 51 at 1–2.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT..............................................................................i

STATEMENT REGARDING ORAL ARGUMENT...........................................iii

TABLE OF CONTENTS.....................................................................................iv

TABLE OF CITATIONS....................................................................................vii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION............................................................................................... 1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE.............................................................................3

    A. Nature of the Case............................................................................... 3

    B. Course of Proceedings and Disposition Below..................................4

    C. Statement of Facts...............................................................................7

    D. Standards of Review............................................................................9

SUMMARY OF THE ARGUMENT..................................................................10

ARGUMENT.....................................................................................................13

    I. The dismissal of the RFRA claim rests on legal errors this Court reviews de novo................................................................................................ 13

        A. The court weighed the pleaded burdens instead of accepting them as true — and treated a completed 28-day incarceration as speculation...................14

        B. The court committed each of the three substantial-burden errors the Supreme Court reversed in Holt v. Hobbs.......................................................15

        C. The court resolved the Government's strict-scrutiny burden at the pleading stage, on materials outside the complaint.....................................20

D. The out-of-circuit motto decisions do not control, and the claim pleaded here is not the claim they decided....................................................................21

E. The judgment cannot be affirmed on the alternative ground of res judicata.......................................................................................................23

II. The constitutional claims were dismissed on the same flawed premises and should be revived for adjudication on a proper record......................................24

III. Dismissal with prejudice — imposed in part "by default" for a single missed deadline — was an abuse of discretion under Betty K Agencies........................29

IV. The shotgun-pleading characterization and the futility ruling cannot sustain a with-prejudice dismissal of the claims pressed on this appeal.......................32

V. The relief sought is modest, prospective, and administrable..........................40

A. The relief is narrow, forward-looking, and administrable.........................40

B. Relief ordered now is the only relief that can arrive in time for the next generation — and the district court's derision of Appellant's intergenerational religious allegations repeats the errors that pervade the judgment................................................................................................41

VI. The denial of Appellant's requested accommodation for court filings bearing the Divine Name merged into the judgment and rests on the same legal errors...........................................................................................................46

A. Background and reviewability...............................................................46

B. The ruling that RFRA "does not apply" inverted the statute's text..........48

C. The alternative Establishment Clause holding conflates accommodation with endorsement....................................................................................49

D. The Court should direct modest relief on remand...................................51

**CONCLUSION**....................................................................................**51**

**CERTIFICATE OF COMPLIANCE**......................................................................**54**

**CERTIFICATE OF SERVICE**............................................................................**54**

**TABLE OF CITATIONS**

 *Pursuant to 11th Cir. R. 28-1(e), asterisks identify the authorities on which Appellant primarily relies.*

**Cases**

American Council of the Blind v. Paulson, 525 F.3d 1256 (D.C. Cir. 2008) .......... 23, 28, 41

Barfield v. Brierton, 883 F.2d 923 (11th Cir. 1989) .......... 47

*Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333 (11th Cir. 2005) .......... 9, 10, 12, 29, 30, 35

Bryant v. Dupree, 252 F.3d 1161 (11th Cir. 2001) .......... 10, 37

*Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) .......... 1, 11, 13, 17, 18, 19, 44, 50, 53

Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, 942 F.3d 1215 (11th Cir. 2019) .......... 24

Catholic Charities Bureau, Inc. v. Wisconsin Labor & Indus. Review Comm'n, 605 U.S. 238 (2025) .......... 39, 49, 50

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993) .......... 25

Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327 (1987) .......... 49

*Cutter v. Wilkinson, 544 U.S. 709 (2005) .......... 12, 49

Elrod v. Burns, 427 U.S. 347 (1976) .......... 32

Foman v. Davis, 371 U.S. 178 (1962) .......... 37

Frazee v. Illinois Dep't of Emp. Sec., 489 U.S. 829 (1989) .......... 18, 39

Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006) .......... 38, 49, 50

*Holt v. Hobbs, 574 U.S. 352 (2015) .......... 1, 11, 14, 15, 16, 17, 18, 20, 23, 35, 38, 40, 44, 53

Kennedy v. Bremerton Sch. Dist., 597 U.S. 507 (2022) .......... 25

*Larson v. Valente, 456 U.S. 228 (1982) .......... 26, 49

Manning v. City of Auburn, 953 F.2d 1355 (11th Cir. 1992) .......... 24

Mayle v. United States, 891 F.3d 680 (7th Cir. 2018) .......... 21, 22

New Doe Child No. 1 v. Congress of the United States, 891 F.3d 578 (6th Cir. 2018) .......... 21, 23

New Doe Child No. 1 v. United States, 901 F.3d 1015 (8th Cir. 2018) .......... 16, 21

Newdow v. Lefevre, 598 F.3d 638 (9th Cir. 2010) .......... 22

Newdow v. Peterson, 753 F.3d 105 (2d Cir. 2014) .......... 21

Stack v. Boyle, 342 U.S. 1 (1951) .......... 27

Susan B. Anthony List v. Driehaus, 573 U.S. 149 (2014) .......... 19, 29, 43

Tannenbaum v. United States, 148 F.3d 1262 (11th Cir. 1998) .......... 9, 14

Tanzin v. Tanvir, 592 U.S. 43 (2020) .......... 38

*Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707 (1981) .......... 1, 11, 17, 18, 39, 44, 50, 53

Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291 (11th Cir. 2018) .......... 33

Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313 (11th Cir. 2015) .......... 10, 33

Wooley v. Maynard, 430 U.S. 705 (1977) .......... 22

**Statutes and Rules**

*Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. .......... passim

42 U.S.C. § 2000bb-1(a)–(c) .......... 1, 13, 14, 34, 48

42 U.S.C. § 2000bb-2(1) .......... 48

42 U.S.C. § 2000bb-2(3) .......... 34

42 U.S.C. § 2000bb-2(4) .......... 14

42 U.S.C. § 2000bb-3(a) .......... 12, 48

42 U.S.C. § 2000cc-5(7)(A) .......... 14, 22

28 U.S.C. § 636(c) .......... 1, 53

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

31 U.S.C. § 5112 .......... 3

18 U.S.C. § 333 .......... 9, 19

31 U.S.C. § 5103 .......... 3, 9, 23

4 U.S.C. § 8 .......... 49

25 U.S.C. § 3001 et seq. .......... 49

36 U.S.C. § 302 .......... 39

Fed. R. App. P. 4(a)(1)(B) .......... 1

Fed. R. App. P. 10(a) .......... 20

Fed. R. App. P. 43(c)(2) .......... 46

Fed. R. Civ. P. 12(b)(6), 12(d), 15(a) .......... 1, 9, 11, 14, 21, 44

Fed. R. Civ. P. 4(i), 4(m), 19, 21 .......... 2, 6, 35, 36, 37

Fed. R. Civ. P. 5(d)(3)(B)(i) .......... 31, 32, 51

S.D. Fla. L.R. 7.1(c)(1) .......... 2, 7, 11, 29

U.S. Const. amend. I .......... 1, 17, 44, 50

U.S. Const. amend. V .......... 1, 2, 13, 27, 34, 51

U.S. Const. amend. VIII .......... 2, 13, 27, 34, 51

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Appellant's claims arise under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., which supplies an express cause of action, id. § 2000bb-1(c), and under the First and Fifth Amendments to the United States Constitution. With the consent of the parties, the Chief United States Magistrate Judge exercised case-dispositive jurisdiction pursuant to 28 U.S.C. § 636(c).

This Court has jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291. The order of February 10, 2026 (Doc. 82), dismissed the operative complaint with prejudice and directed the Clerk to close the case; it is a final decision disposing of all claims of all parties. Appellant filed his notice of appeal, docketed March 25, 2026 (Doc. 84), within the sixty days allowed where the United States is a party. Fed. R. App. P. 4(a)(1)(B). The appeal is timely.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in dismissing Appellant's RFRA claim under Rule 12(b)(6) by weighing and discounting, rather than accepting as true, well-pleaded allegations of substantial burden — including a completed twenty-eight-day incarceration for inability to pay cash-only bail — by grading Appellant's religious practices as "trivial" and by relying on their idiosyncrasy, contrary to *Burwell v. Hobby Lobby Stores, Inc.*, *Thomas v. Review Board*, and *Holt v. Hobbs*,

1

and by resolving the Government's strict-scrutiny burden on materials outside the complaint.

2. Whether the district court erred in dismissing Appellant's Free Exercise Clause, Establishment Clause, Eighth Amendment excessive-bail, and Fifth Amendment due-process claims at the pleading stage.

3. Whether the district court abused its discretion by dismissing the operative complaint with prejudice "by default" under Southern District of Florida Local Rule 7.1(c)(1) for a single missed response deadline, without finding a clear pattern of delay or willful contempt and without finding that lesser sanctions would not suffice.

4. Whether the district court's characterization of the operative complaint as a shotgun pleading, its determination that any further amendment would be futile, and its with-prejudice dismissal of newly named official-capacity defendants for non-service — entered before the service period of Fed. R. Civ. P. 4(m) had expired — can sustain the judgment.

5. Whether the district court erred in denying Appellant's requested religious accommodation concerning the disposition of paper court filings bearing the Divine Name — ruling that RFRA "does not apply" to the implementation of federal law in this litigation and that a neutral notice-and-return procedure would

violate the Establishment Clause — where those orders merged into the final judgment and the paper record now faces routine destruction.

**STATEMENT OF THE CASE**
**A. Nature of the Case**

Appellant David Morris Clayman is an observant Jewish American. His religious practice, grounded in Talmudic authority (Tractate Rosh Hashanah 18b) and in Megillat Ta'anit's account of the Third of Tishrei — the day commemorating when the Sages weaned the Jewish people from superfluously inscribing the Divine Name on secular documents — imposes on him affirmative custodial duties, known as *shaimos* duties, toward physical media bearing the Name of G-d. Doc. 78-1 at 56; Doc. 71 at 4–5, 11. Under these duties as Appellant sincerely holds them, he may not carry media bearing the Name into lavatories or other profane spaces; he may not participate in the casual destruction of such media by shredding, incineration, or disposal as refuse; and any such media that enters his possession becomes his religious charge, to be safeguarded and ultimately accorded burial-type disposition. Doc. 71 at 4–5; Doc. 78-1 at 15, 22, 33.

Because Congress has directed that the national motto appear on United States coins and currency, see 31 U.S.C. § 5112(d)(1), every unit of the Nation's exclusive legal tender, see 31 U.S.C. § 5103, is an object of those duties. The consequence, as pleaded, is that Appellant cannot handle, carry, accept, or spend

cash without either violating his faith or assuming custodial obligations that make ordinary commercial life impossible. His complaint seeks prospective relief only: principally, that future currency designs employ a religiously modest formulation of the motto — Appellant has proposed "In G We Trust" — or another accommodation Congress and the Treasury may select. He seeks no damages and no recall of currency in circulation. Doc. 78-1 at 24, 71–72.

**B. Course of Proceedings and Disposition Below**

Appellant filed his original complaint pro se on July 15, 2025 (Doc. 1) and, after Appellees moved to dismiss, filed an amended complaint as of right on August 4, 2025 (Doc. 19) (the "FAC"). Appellees again moved to dismiss (Doc. 27). Appellant moved for leave to file a second amended complaint (Doc. 35).

The litigation itself generated new objects of Appellant's custodial duties. Because pro se litigants are denied electronic filing in the Southern District of Florida, every submission had to be printed, mailed, and served on paper, and certain filings — principally the religious source texts required to plead the claims intelligibly — bore the Divine Name. Doc. 40 at 1–3. On September 10, 2025, Appellant moved for a modest accommodation: advance written notice before the routine destruction of paper filings bearing the Name, an opportunity to retrieve the identified pages at his own expense at the conclusion of the case, and, for any Government copies containing privileged work product, a certification of respectful disposition. Doc. 40 at 4–5. Appellees opposed. Doc. 42. By order of

4

September 29, 2025, the court denied the motion and the accompanying request for a hearing, holding that RFRA "does not apply in this context where Plaintiff wishes for the Government, and possibly the Court, to change its usual practices in this litigation," and that the relief "would clearly infringe on the Establishment Clause." Doc. 49 at 2–3. Reconsideration was denied by order entered November 24, 2025. Doc. 72.

By order entered on the docket on November 24, 2025 (Doc. 71) (the "November Order"), the district court dismissed the FAC without prejudice for failure to state a claim, denied leave to file the proposed second amended complaint as futile, and granted Appellant "one more chance to amend his complaint," directing him to file a new complaint "making specific allegations that are in full compliance with the applicable case law and the Federal Rules of Civil Procedure." Doc. 71 at 14–15. In addressing the RFRA count, the November Order acknowledged Appellant's allegation "that he was incarcerated for 28 days due to his inability to pay cash-only bail," Doc. 71 at 4, yet concluded two pages later that Appellant's bail-related burden was speculative because "there is no allegation that posting bail will become necessary," Doc. 71 at 6. It characterized other pleaded burdens as "rather trivial," reasoned that Appellant "can avoid many of these situations without any difficulty" because "everyday life in the United States has become increasingly cashless," and asked why Appellant could not "simply

deposit" religiously encumbered cash "with the bank." Doc. 71 at 6–7. Relying on a Federal Reserve webpage outside the pleadings, the court also reasoned that "the 2025 currency operating budget new currency alone is $1,040.0 million," and that "rehauling all U.S. currency and coins is not as simple of an endeavor as Plaintiff argues." Doc. 71 at 8. In discussing the Establishment Clause count, the court invoked Appellant's candid acknowledgment that his currency practice may be "possibly wholly singular" among American Jews. Doc. 71 at 11–12. The court expressly declined to reach Appellees' res judicata argument. Doc. 71 at 8 n.5.

Appellant filed the operative complaint, captioned the Third Amended Complaint (Doc. 78-1) (the "TAC"), which the district court deemed "the operative complaint in this case," Doc. 80, and which expanded his substantial-burden allegations, see Doc. 78-1 at 12–22, incorporated his prior pleadings by reference, and named additional official-capacity defendants — including the Attorney General, who administers the federal bail system and through whom the August 25, 2025 executive actions concerning cash bail operate. Doc. 78-1 at 68; Doc. 71 at 14. No summonses had issued for the newly named defendants when the case was dismissed, and the ninety-day period for service under Fed. R. Civ. P. 4(m), measured from the filing of the operative complaint, had not yet expired. See Doc. 82 at 2–3. On January 8, 2026, the court denied preliminary injunctive relief concerning then-proposed new currency designs, ruling "no hearing is necessary,"

and grounding its conclusion in part on a historical recitation that the Declaration of Independence "refers to 'Nature's G-d.'" Doc. 79 at 4–5. Appellees moved to dismiss the TAC on January 21, 2026 (Doc. 81). Appellant's response was due February 4, 2026; through inadvertence amid the press of this litigation, Appellant — who had personally drafted, printed, and mailed every filing in the case because pro se litigants are denied electronic filing in the Southern District of Florida — did not file one.

On February 10, 2026, the district court granted the motion to dismiss in a three-page order (Doc. 82) (the "Final Order"). The Final Order rested "first" on default: "the Motion is due to be granted by default under Southern District of Florida Local Rule 7.1(c)(1), as Plaintiff has failed to timely respond." Doc. 82 at 1. It rested "second" on the merits "for the reasons stated in" the November Order, adding that the TAC "does not rectify the deficiencies and issues previously identified." Id. It further characterized the TAC as an impermissible shotgun pleading, observed that newly named defendants had not been served, deemed any further amendment futile, dismissed the TAC with prejudice, and closed the case. Doc. 82 at 2–3. The Final Order made no finding that Appellant's missed deadline was willful or contumacious and no finding that lesser sanctions would not suffice. This appeal followed. Doc. 84.

**C. Statement of Facts**

The well-pleaded allegations, which must be taken as true at this stage, include the following. Appellant was incarcerated for twenty-eight days because he could not pay cash-only bail consistent with his faith, and he remains exposed to pretrial detention wherever cashless bail is unavailable. Doc. 71 at 4; Doc. 78-1 at 21, 34. Executive actions of August 25, 2025 have pressured state and local jurisdictions away from cashless bail, Doc. 71 at 14, magnifying that exposure. At his September 3, 2023 wedding, Appellant received more than $2,000 in cash gifts that his religious obligations did not permit him to use, and which he was religiously compelled to donate in full to lifesaving charity. Doc. 71 at 5, 7, 12; Doc. 78-1 at 15–17. He is excluded from employment involving cash handling; when he inquired about a barista position, he was told that his need to avoid handling currency likely could not be accommodated. Doc. 78-1 at 12. He faces surcharges on non-cash payment, cannot use cash-only tolls, parking, laundromats, vendors, and services, cannot tip or give charity in the ordinary way, cannot accept small-dollar cash contributions, cannot hold emergency cash reserves, and cannot enter a public restroom carrying currency bearing the Name without violating his duties — with the result that he must either forgo carrying cash altogether or adopt burdensome protective measures. Doc. 71 at 4–5; Doc. 78-1 at 12–22. The FAC and TAC allege that these exclusions operate cumulatively and unavoidably,

8

because cash is the only universal legal tender for "all debts, public charges, taxes, and dues." 31 U.S.C. § 5103; Doc. 78-1 at 13–22.

Nor does the burden end at the point of transaction; it begins there. Currency Appellant cannot refuse — such as the wedding gifts — becomes sterile in his hands: consistent with his duties it can neither be spent nor surrendered into a banking system that culminates in machine shredding. The record reflects Appellant's stated intention, absent accommodation, to sever the Motto from the notes he holds, to preserve the severed Name for Jewish burial, and to bear the attendant risk of federal prosecution under 18 U.S.C. § 333. Doc. 78-1 at 34–35; Doc. 81 at 8.

**D. Standards of Review**

Issues 1 and 2: This Court reviews de novo a dismissal for failure to state a claim under Rule 12(b)(6), accepting the complaint's well-pleaded allegations as true and construing them in the light most favorable to the plaintiff; pro se pleadings are held to a less stringent standard than pleadings drafted by lawyers and are liberally construed. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam). Issue 3: A dismissal imposed as a sanction, including a dismissal with prejudice for noncompliance with court rules, is reviewed for abuse of discretion, but a court necessarily abuses its discretion when it applies the wrong legal standard. *Betty K Agencies, Ltd. v. M/V MONADA*, 432 F.3d 1333, 1337 (11th Cir. 2005). Issue 4: Dismissal on shotgun-pleading grounds

is reviewed for abuse of discretion, *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015); denial of leave to amend is reviewed for abuse of discretion, but a futility determination — a legal conclusion that an amended complaint would not survive dismissal — is reviewed de novo. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). Issue 5: The denial of a requested religious accommodation is reviewed for abuse of discretion, but the antecedent ruling that RFRA does not apply is a conclusion of law reviewed de novo, and a court necessarily abuses its discretion when it rests its ruling on an error of law. *Betty K Agencies*, 432 F.3d at 1337.

## SUMMARY OF THE ARGUMENT

No court of appeals — including this one — has ever confronted the claim actually pleaded here. Prior motto litigation was brought by plaintiffs whose injury was the offense of carrying a message they rejected. Appellant's injury is categorically different: his faith affirmatively obligates him to protect physical media bearing the Divine Name from profanation, so every banknote is not a message he dislikes but a sacred charge he cannot safely touch. The Government's decision to inscribe the Name on the Nation's only universal legal tender therefore does not offend him; it conscripts him, excluding him from cash commerce, from cash-only bail, from categories of employment, and — for twenty-eight days — from liberty itself.

The district court dismissed this claim at the pleading stage by committing each of the three analytical errors the Supreme Court identified and reversed in *Holt v. Hobbs*, 574 U.S. 352 (2015). It reasoned that the burden was slight because Appellant could avoid it — by depositing his cash, using debit cards, and relying on an "increasingly cashless" economy — the very alternatives-based reasoning *Holt* rejected. It graded the burdened practices as "rather trivial," though *Hobby Lobby* and *Thomas* place the religious significance of a practice beyond judicial second-guessing. And it counted against Appellant that his practice may be "possibly wholly singular," though *Holt* holds that even an idiosyncratic belief is fully protected. The court compounded these errors by treating a completed twenty-eight-day incarceration as speculation, by construing pleading tensions against a pro se plaintiff, and by resolving the Government's strict-scrutiny burden — on cost figures drawn from a webpage outside the record — at the Rule 12(b)(6) stage, where that burden was not Appellant's to disprove. The out-of-circuit motto decisions on which the court relied are not binding in this Circuit, addressed materially different claims, and rest on reasoning that cannot be reconciled with *Holt*.

The judgment's procedural footing is equally infirm. The Final Order granted dismissal with prejudice "by default" under Local Rule 7.1(c)(1) because a pro se litigant — denied electronic filing and litigating by mail — missed a single

response deadline. Under *Betty K Agencies,* dismissal with prejudice is an extreme sanction available only upon a clear pattern of delay or willful contempt and an express finding that lesser sanctions would not suffice. The court found neither, and the record would support neither. Its alternative merits rationale incorporated an order analyzing a superseded pleading and disposed of the operative complaint's new allegations in a single conclusory sentence. And its shotgun-pleading and futility rationales cannot carry a with-prejudice dismissal where the core RFRA claim was concededly intelligible — the Government briefed it and the court adjudicated it — and where a more carefully drafted complaint, confined to the claims Appellant now presses, would state a claim.

The same errors reached beyond the merits rulings. When the litigation itself generated paper filings bearing the Divine Name — because this district denies pro se litigants electronic filing and compels printed submission and service — Appellant asked only for notice before their routine destruction and an opportunity to retrieve them at his own expense. The court held that RFRA "does not apply" to the Government's and the court's "usual practices in this litigation," inverting the text of 42 U.S.C. § 2000bb-3(a), which extends the statute to "all Federal law, and the implementation of that law," and it held that a neutral notice-and-return procedure would violate the Establishment Clause, conflating permissible accommodation with endorsement contrary to *Cutter v. Wilkinson*, 544 U.S. 709

(2005). Those orders merged into the judgment; the destruction clock on the paper record is now running; and the modest procedure Appellant requested remains fully available on remand.

Appellant has narrowed this appeal deliberately — abandoning the Takings count, the miscellaneous counts, the class-certification request, and the declaratory request criticized in the Final Order's second footnote — and presses his RFRA, Free Exercise, Establishment Clause, Eighth Amendment excessive-bail, and Fifth Amendment due-process claims, together with the joinder of the official-capacity defendants responsible for the executive actions pressing jurisdictions toward cash-only bail. He asks this Court to vacate the judgment and remand so that, for the first time, the substantial-burden question this Circuit has never answered can be adjudicated on a proper record and correct legal standards.

## ARGUMENT

### I. The dismissal of the RFRA claim rests on legal errors this Court reviews de novo.

RFRA prohibits the Government from substantially burdening a person's exercise of religion, even through rules of general applicability, unless the Government demonstrates that the burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1(a)–(b). Congress enacted the statute "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014); Doc. 71 at 5 (quoting same). "Religious exercise" includes "any exercise of

religion, whether or not compelled by, or central to, a system of religious belief."
42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). The claimant's threshold burden is to
plead (and ultimately prove) a sincere religious exercise and substantial
governmental pressure upon it; the compelling-interest and least-restrictive-means
showings belong to the Government alone. § 2000bb-1(b); *Holt v. Hobbs*, 574 U.S.
352, 362 (2015). The district court's analysis inverted nearly every element of this
framework.

**A. The court weighed the pleaded burdens instead of accepting them as true — and treated a completed 28-day incarceration as speculation.**

The Rule 12(b)(6) posture required the court to accept Appellant's factual
allegations as true and to construe his pro se pleadings liberally. *Tannenbaum*, 148
F.3d at 1263. The November Order — whose reasoning the Final Order adopted
wholesale, Doc. 82 at 1 — did the opposite. It acknowledged the allegation "that
he was incarcerated for 28 days due to his inability to pay cash-only bail," Doc. 71
at 4, and then held the bail burden speculative because "there is no allegation that
posting bail will become necessary," Doc. 71 at 6. Those propositions cannot both
be true. A month of liberty already lost is not conjecture about the future; it is the
completed past, and it grounds the plausibility of the pleaded ongoing exposure.
Whatever may be said of an adherent who merely fears that a cash-only obligation
might someday arise, an adherent who has already served twenty-eight days

14

because his faith barred the only payment the state would accept has pleaded a burden as concrete as burdens come.

The same weighing pervades the remainder of the analysis. The court pronounced pleaded burdens "speculative," "often avoidable," and "generally negligible in scope," Doc. 71 at 7 — conclusions that resolve disputed factual questions of frequency, avoidability, and cumulative effect against the pleader, at a stage when all reasonable inferences run the other way. It faulted Appellant for an asserted internal tension — that he described protective measures for restroom entry while elsewhere alleging he cannot carry currency at all, Doc. 71 at 7 — when the liberal-construction rule required reading those allegations together as describing the dilemma itself: either total abstention from cash or burdensome protective rituals, each a cost of fidelity. Construing a pro se complaint's tensions as concessions is the inverse of the standard this Court applies.

**B. The court committed each of the three substantial-burden errors the Supreme Court reversed in Holt v. Hobbs.**

In *Holt*, a unanimous Supreme Court reversed a substantial-burden holding infected by three errors of reasoning. The correspondence between those errors and the November Order is nearly one to one.

*First: alternatives reasoning.* The *Holt* district court found no substantial burden because the claimant could practice his religion in other ways. See 574 U.S. at 361–62. The Supreme Court held this approach improperly imported First

15

Amendment prison jurisprudence into a statutory scheme that "provides greater protection": the "substantial burden" inquiry "asks whether the government has substantially burdened religious exercise . . . not whether the . . . claimant is able to engage in other forms of religious exercise." Id. at 361–62 (citations omitted). The November Order reasons in exactly the condemned register: Appellant "can avoid many of these situations without any difficulty" because "everyday life in the United States has become increasingly cashless"; he "does not explain why he could not simply deposit the money with the bank and then use alternative payment methods"; his surcharge allegations "do[] not take into account his ability to use debit cards." Doc. 71 at 6–7. Each of these is an assertion that Appellant can live around the burden — not a determination that the Government has failed to impose one. And the proposed workarounds themselves misapprehend the pleaded religious exercise: depositing encumbered currency surrenders media bearing the Name into a system that culminates in machine shredding, the precise profanation Appellant's *shaimos* duties forbid him to facilitate. Doc. 78-1 at 15. The Eighth Circuit's observation that "there are many alternatives" to cash, *New Doe Child No. 1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018), quoted at Doc. 71 at 5, stands in unresolved tension with *Holt* on this exact point — a tension this Court, writing on a clean slate, need not import.

16

*Second: judicial grading of religious significance.* The *Holt* district court suggested the burden was "slight." 574 U.S. at 362. The Supreme Court reiterated that once sincerity is established, the judicial function is "narrow": "it is not for us to say that [a claimant's] religious beliefs are mistaken or insubstantial. Instead, our narrow function . . . in this context is to determine whether the line drawn reflects an honest conviction." *Hobby Lobby*, 573 U.S. at 724–25 (quotation marks and citation omitted); accord *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"). The November Order pronounced the burdened practices — charity to the needy, tips to service workers, small transactions of communal life — "rather trivial." Doc. 71 at 6. That is a judicial valuation of the religious and human significance of Appellant's obligations, a subject on which the court did "not doubt Plaintiff's strongly held religious beliefs," Doc. 79 at 2, and on which its doubt or approval was, in any event, beside the point. The pressure RFRA polices is the pressure *Thomas* described: where government action "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists," and "[w]hile the compulsion may be indirect, the infringement . . . is nonetheless substantial." 450 U.S. at 717–18. A regime in which the only universal legal tender is religiously forbidden to an adherent — on pain of jail when bail is

17

cash-only, of unemployment where cash-handling is required, and of forfeiting $2,000 in wedding gifts — exerts precisely that pressure, in amounts the Government itself has treated as substantial: *Hobby Lobby* deemed economic consequences cognizable without demanding that they be existential, and the forced-donation loss here exceeds the per-employee statutory penalty the *Hobby Lobby* Court found significant. 573 U.S. at 691.

*Third: idiosyncrasy.* The *Holt* district court "went astray when it relied on petitioner's testimony that not all Muslims believe that men must grow beards," because even an "idiosyncratic" belief is protected: the statutory guarantee, "no less than the guarantee of the Free Exercise Clause, is not limited to beliefs which are shared by all of the members of a religious sect." 574 U.S. at 362–63 (internal quotation marks omitted) (quoting *Thomas*, 450 U.S. at 715–16); see also *Frazee v. Illinois Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989). The November Order deployed Appellant's own candor against him, reasoning that because his currency practice is "possibly wholly singular" among American Jews, his claims of burden were self-contradictory. Doc. 71 at 11–12. Millions of American Jews hyphenate the Divine Name in their own writing, Doc. 71 at 11 (quoting FAC); Appellant applies the same principle with greater rigor to government-printed instances of the Name. That his rigor may be rare is, under *Holt*, *Thomas*, and *Frazee*, legally irrelevant. RFRA protects the conscientious outlier by design; a statute enacted "to

18

provide very broad protection for religious liberty," *Hobby Lobby*, 573 U.S. at 693, is not forfeited by being the first to need it.

The burden also outlasts every transaction that inflicts it. Because Appellant's duties attach to any currency that enters his possession, every dollar he cannot refuse becomes sterile trust property in his hands. He may not spend it. He may not deposit it into a system whose terminus is the shredder. His only exits are three: donate it to lifesaving charity and lose it; hold it indefinitely — uninvested, earning nothing, wasting against inflation — as sacred property he never sought; or sever the Motto from each note for eventual burial and expose himself to federal prosecution under 18 U.S.C. § 333 for mutilating currency. The record reflects this trilemma: Appellant pleaded his intention, if no lawful accommodation comes, to cut the Motto from the notes he holds and preserve the severed Name for burial, Doc. 78-1 at 17, 34–35, and the Government's response was to call the stated intention "absurd" — not to disavow prosecuting it. Doc. 81 at 8. Under *Susan B. Anthony List*, an intention to engage in conduct arguably proscribed by statute, met with a credible threat of enforcement, is a present injury. 573 U.S. at 159. A citizen forced to choose among his faith, his property, and his criminal exposure is injured three ways at once — and the injury compounds rather than dissipates with time, growing heavier still with any parental role in Appellant's future, when children in

19

his care would ordinarily handle the small cash of childhood that his household's

observance must instead forgo.[2]

**C. The court resolved the Government's strict-scrutiny burden at the pleading stage, on materials outside the complaint.**

Under RFRA's burden-shifting structure, once a substantial burden is

shown, the burden shifts to the government to demonstrate that burdening "the

particular claimant" is the least restrictive means of furthering a compelling

interest. *Holt*, 574 U.S. at 362–63 (quotation marks omitted); 42 U.S.C. § 2000bb-

1(b). Those are the Government's showings, ordinarily made on evidence. Yet the

November Order disposed of least-restrictive-means at the pleading stage and in

Appellant's column: it dismissed his proposed accommodations — including the

minimal, forward-looking alteration to "In G We Trust" for future designs — by

reasoning that "rehauling all U.S. currency and coins is not as simple of an

endeavor as Plaintiff argues," and by citing, for the proposition that "the 2025

currency operating budget new currency alone is $1,040.0 million," a Federal

Reserve webpage nowhere referenced in the pleadings. Doc. 71 at 8.

---

2By way of post-judgment illustration only — offered not as record evidence, see Fed. R. App. P. 10(a), but solely as bearing on the live and continuing character of this controversy: on May 22, 2026, Appellant sold his 24-karat gold wedding ring to an estate jeweler for $310.00. The buyer, closing for the day, could pay only in cash — cash remaining the one instantaneous means of payment between strangers. Appellant accepted three $100 notes and one $10 note in the hope of prevailing in this litigation; those notes now sit in a safe, unusable, uninvested, and depreciating, held in trust against this Court's judgment. Burdens of this kind accrue with every month the controversy remains unresolved.

This was error three times over. It relieved the Government of a statutory burden it never carried, before an answer was filed and without any evidentiary record. It resolved a quintessentially factual question — the cost and feasibility of alternative accommodations — against the pleader on a motion to dismiss. And it did so on material outside the four corners of the complaint, which Rule 12(d) permits only upon conversion to summary judgment with notice and an opportunity to respond — neither of which occurred. The error is also substantive: Appellant's operative request is prospective only, directed at *future* designs. Doc. 78-1 at 25, 72. The Treasury redesigns currency in the ordinary course; a going-forward change to new issuances requires no recall and no "rehaul[]" of the money supply, Doc. 71 at 8 — a mismatch between the relief pleaded and the relief the court costed that only discovery and adversarial testing could have exposed. Whether the Government can carry strict scrutiny is a question for remand; it is not a question a court may answer for the Government at the threshold, on judicial notice of a webpage.

**D. The out-of-circuit motto decisions do not control, and the claim pleaded here is not the claim they decided.**

The November Order rested on a wall of persuasive authority: *Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014); *New Doe Child No. 1 v. Congress of the United States*, 891 F.3d 578 (6th Cir. 2018); *New Doe Child No. 1 v. United States*, 901 F.3d 1015 (8th Cir. 2018); *Mayle v. United States*, 891 F.3d 680 (7th Cir.

2018); and *Newdow v. Lefevre*, 598 F.3d 638 (9th Cir. 2010). Doc. 71 at 5–6. None binds this Court. The question whether the motto's inscription on the exclusive legal tender can substantially burden religious exercise is open in the Eleventh Circuit, and this Court owes those decisions only the deference their reasoning earns.

Their reasoning does not reach this case. The paradigm plaintiff in that line objected to carrying or being associated with a religious message he rejected — an offense-based theory the courts analogized to compelled speech and found too slight, in part because "[t]he bearer of currency is . . . not required to publicly advertise the national motto." *Wooley v. Maynard*, 430 U.S. 705, 717 n.15 (1977). Appellant's theory is the mirror image. He does not object that the motto says too much to him; his faith holds that the Name it contains is sacred, and that its presence on disposable media makes every banknote his religious charge. The burden is not expressive but custodial — an affirmative duty triggered by possession — and it is defined by the adherent's sincere understanding, which RFRA protects "whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). *Mayle*'s premise that "using money is not a religious exercise," 891 F.3d at 686–87, quoted at Doc. 71 at 6, therefore answers a question Appellant does not ask: the religious exercise here is the protection of the Divine Name, and the Government's inscription conscripts every dollar into the

domain of that duty. The Sixth Circuit's decision — in litigation to which Appellant was a party — turned on the plaintiffs' failure to plead that their burdens were unavoidable. *New Doe Child*, 891 F.3d at 590–91. The FAC and TAC plead precisely the unavoidability that was found missing there: cash-only bail backed by incarceration, cash-only obligations that § 5103 makes universally dischargeable in legal tender, and employment and civic exclusions no substitute payment method cures. Doc. 71 at 4–5; Doc. 78-1 at 12–22. And to the extent the Eighth Circuit's alternatives-based reasoning conflicts with *Holt*, see supra Part I.B, this Court should decline to adopt it.

Finally, *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008), though a Rehabilitation Act case, illuminates the burden inquiry the district court refused to conduct. There the D.C. Circuit held that blind Americans' inability to use paper currency independently denied them meaningful access to the medium of exchange, notwithstanding the availability of credit cards and assistance. Appellant's pleaded exclusion is broader — it extends to coins and to every protective workaround — and the district court's response, that *Paulson* is "easily distinguishable" by statute, Doc. 71 at 11, addressed its holding but not its logic: exclusion from the universal medium of exchange is not a trivial inconvenience. It is a disability the law elsewhere takes seriously.

**E. The judgment cannot be affirmed on the alternative ground of res judicata.**

Below, Appellees urged claim preclusion based on the Sixth Circuit litigation. The district court "w[ould] not consider" that argument, expressly resting dismissal on other grounds. Doc. 71 at 8 n.5. Appellant opposed preclusion on an extensive set of independent grounds, presented both in open filings and in submissions under seal, see Doc. 65; Doc. 66 (sealed) — including, by way of illustration only, that central pleaded injuries, such as the September 3, 2023 wedding-gift burden, arose years after the 2018 judgment and could not have been litigated in it, see *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) — and those arguments remain wholly unadjudicated. Appellant does not brief them here; he preserves every one of them. Should Appellees offer preclusion as an alternative basis for affirmance, this Court should decline the invitation: affirming on a record-intensive affirmative defense the district court expressly declined to reach — resting on arguments, some sealed, that no court has yet weighed — would deny Appellant the first-instance ruling to which he is entitled, a ruling that, when made, should be made in his favor. The issue belongs to the district court on remand.

**II. The constitutional claims were dismissed on the same flawed premises and should be revived for adjudication on a proper record.**

*Free Exercise.* The Eleventh Circuit requires a Free Exercise plaintiff to plead a sincerely held religious belief and a law that impacts his ability to hold or act on it. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d

1215, 1246 (11th Cir. 2019). Both components are pleaded: sincerity is undisputed, see Doc. 79 at 2, and the currency statutes' impact is set out at length. The November Order dismissed the count "[f]or the same reasons discussed above," Doc. 71 at 10 — that is, on the same substantial-burden analysis shown in Part I to be legally erroneous — and on the premise that the statutes are neutral and generally applicable. Appellant preserves his contention that a statute commanding the inscription of one tradition's conception of the sacred Name on the exclusive legal tender is not neutral among religions as applied to faiths, like Appellant's, that bear custodial duties toward that Name: it affirmatively burdens the observant custodian while resting lightly on traditions that attach no such duties. Cf. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993) (neutrality inquiry extends beyond facial text to operation). At minimum, because the count was dismissed derivatively of the RFRA analysis, it should rise or fall with that analysis on remand.

*Establishment Clause.* The Establishment Clause is now interpreted "by reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535–36 (2022) (quotation marks omitted); Doc. 71 at 11 (quoting same standard). Appellant respectfully submits that the historical record, examined rather than assumed, supports him. The Founders' civic vocabulary was studiously circumspect: the Declaration of Independence employs the deistic

25

circumlocution "Nature's G-d," and the Constitution contains no reference to the Deity at all. The district court itself recited the operative chronology: the Name first appeared on a coin in 1864, and on paper currency only pursuant to 1950s legislation. Doc. 79 at 4. The practice challenged here is thus not a founding-era tradition but a Civil War-era innovation, entrenched in the mid-twentieth century — and the founding practice it displaced was one of deliberate restraint in sacralizing civic instruments. It is respectfully noted that Thomas Jefferson, the draftsman whose careful phrasing the court invoked, was also the compiler of the so-called Jefferson Bible, from which he physically excised supernatural passages: whatever else the founding generation's example teaches, it does not teach that the fully spelled Divine Name belongs on every instrument of commerce. Appellant preserves this claim for adjudication on a developed historical record.

A further and independent Establishment Clause defect went unaddressed below: the currency statutes do not merely reference the Divine — they select and officially promulgate one particular rendering of the sacred Name, and they embed in law an official theological judgment that this Name is suitable for inscription on disposable, profane media. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," *Larson v. Valente*, 456 U.S. 228, 244 (1982), and laws granting a denominational preference are suspect and draw strict scrutiny, id. at 246. By codifying the

premise that the fully spelled Name is casually printable — a premise some traditions accept and Appellant's, among others, rejects as profanation — the Government takes an official position on a contested theological question and prefers the traditions that hold the Name freely printable over those that hold it too sacred for such use. Appellant argued below that this places the Government "in the role of theological arbiter, endorsing certain religious understandings over others." Doc. 71 at 11 (quoting Doc. 36 at 10). It is no answer that the motto is traditional; the antecedent question is one no branch of government is competent to answer by statute: which rendering of the Name of G-d, if any, is fit for mass printing, restroom carriage, and machine shredding. The Constitution withholds that question from official resolution.

*Eighth Amendment — excessive bail — and Fifth Amendment — due process.* Appellant renews his claims that cash-only bail regimes, as applied to an adherent whose faith forbids handling the only accepted medium of payment, violate the Excessive Bail Clause and deny due process of law. The excessiveness inquiry ordinarily compares an amount of bail against the Government's interest in assuring the accused's appearance. Cf. *Stack v. Boyle,* 342 U.S. 1, 5 (1951) (bail set at a figure higher than reasonably calculated to assure the accused's presence is excessive under the Eighth Amendment). But for Appellant the constitutional defect is not arithmetic; it is the medium. A bail of one dollar — of one cent —

payable only in currency bearing the fully spelled Name is, to him, as insurmountable as a million-dollar bond, because what stands between him and his liberty is not a sum he lacks but a profanation his faith forbids. Where no amount, however nominal, can be religiously tendered, every amount is functionally infinite; and bail that the accused can never lawfully-in-conscience satisfy, at any price, is excessive in the purest sense the Clause knows. That is not hypothesis. It has already cost Appellant twenty-eight days of liberty, Doc. 71 at 4, and, as pleaded, were he arrested tomorrow in a cash-only posture in Palm Beach County, where he lives, or Miami-Dade County, which he frequents, a one-penny bail would hold him in jail indefinitely. Doc. 78-1 at 35–36.

Nor is the answer that someone else can pay. Constitutional rights are personal; pretrial liberty conditioned on the intercession of relatives or friends is not liberty secured by right but liberty held at another's pleasure — and, as pleaded, Appellant cannot count on family or friends to post bail arising from his civil-rights advocacy. Doc. 78-1 at 36, 63. The D.C. Circuit rejected precisely this move in *Paulson*, discussed supra Part I.D: access to a fundamental medium that exists only through dependence on the assistance of others is part of the deprivation, not the cure for it. The remedy is as modest as the right is basic: Appellant should be able to self-pay bail, anywhere in Florida and throughout the United States, with the credit cards and digital payment instruments that he — like

28

tens of millions of cashless Americans — customarily carries. The district court

deemed the claim speculative, Doc. 71 at 6, and Appellees offered a bail

bondsman, Doc. 81 at 7–8. Both responses fail. Under *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 158 (2014), a substantial risk of future injury supports

adjudication now; an injury already suffered once, compounded by the August 25,

2025 executive actions pressuring jurisdictions away from cashless bail, Doc. 71 at

14, is the paradigm of such risk — and the daily apprehension it imposes on a

citizen's civic life is itself an ongoing injury no American should carry. And the

bondsman "alternative" concedes the constitutional problem rather than solving it:

it taxes the presumptively innocent religious observer with a nonrefundable

premium, as the price of pretrial liberty, that others need not pay. Doc. 78-1 at 36,

62–63. These claims are intertwined with the RFRA substantial-burden analysis

and should be adjudicated with it on remand.

**III. Dismissal with prejudice — imposed in part "by default" for a single missed deadline — was an abuse of discretion under Betty K Agencies.**

The Final Order's first and leading ground was procedural default: "the

Motion is due to be granted by default under Southern District of Florida Local

Rule 7.1(c)(1), as Plaintiff has failed to timely respond to the Motion." Doc. 82 at

1. The sanction imposed was the most severe known to civil procedure —

dismissal with prejudice, a merits judgment with claim-preclusive effect. This

Court's law on that pairing is unambiguous: a dismissal with prejudice "is an

extreme sanction that may be properly imposed only when: (1) a party engages in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice." *Betty K Agencies*, 432 F.3d at 1337–38 (quotation marks omitted). In *Betty K* itself, this Court vacated a with-prejudice dismissal entered for noncompliance with court rules where the district court "made no finding" of willfulness and "failed to find that lesser sanctions would be inadequate." Id. at 1339–40.

The Final Order makes neither finding, and the record would support neither. Appellant missed one response deadline, through inadvertence, in a case he had otherwise litigated with unusual intensity — filing, by the Government's own count, more than a dozen motions and responses, Doc. 81 at 15, each one hand-printed and mailed because the district's rules deny pro se litigants electronic filing. A single lapse by a paper-bound pro se litigant is the paradigm of "inadvertent and isolated" error, not a "clear pattern of delay or willful contempt." *Betty K*, 432 F.3d at 1339. And an array of lesser responses lay at hand — an order to show cause, a short extension, dismissal without prejudice — none of which the court considered on the record. That the default rationale was joined by an alternative merits rationale does not insulate it: where an order rests expressly on an impermissible sanction ground, and the alternative ground is itself erroneous, see supra Part I, the judgment cannot stand on either.

30

The mail-bound posture was not of Appellant's choosing — the court's own rulings created it. Appellant moved at the outset for leave to file electronically, cataloguing the burdens conventional filing imposes on an unrepresented party: hundreds of dollars in mailing costs, hours consumed per filing, docketing delays and out-of-order entries, and a practical deadline that closes when the post office does, while the Government's counsel files until 11:59 p.m. through CM/ECF. Doc. 18; Doc. 51 at 14–15. The court denied the motion in a paperless order resting entirely on the district's CM/ECF Administrative Procedure 2C. Doc. 20. But the Federal Rules preserve a second, case-specific avenue that order never addressed: an unrepresented person "may file electronically only if allowed by *court order* or by local rule." Fed. R. Civ. P. 5(d)(3)(B)(i) (emphasis added). A court empowered to grant case-specific leave by order, but which declines on the sole ground that a general procedure forbids registration, has not exercised the discretion the Rule confers — it has treated a discretionary question as a closed one. Appellant preserved the objection throughout. E.g., Doc. 51 at 14–15; Doc. 63 at 10. The categorical asymmetry between represented and unrepresented litigants also raises the equal-treatment concerns Appellant preserved below, Doc. 51 at 15, though the Court need not reach them, because Rule 5(d)(3)(B)(i) supplies a narrower answer. The point matters here for its consequence: the court consigned Appellant to the mails, then imposed litigation's most severe sanction for a single

31

mail-era lapse. On remand, the district court should be directed to consider leave for Appellant to file electronically under Rule 5(d)(3)(B)(i).

Nor can the merits rationale do independent work. It consists of incorporation — "for the reasons stated in" the November Order — plus a single conclusory sentence that the TAC "does not rectify the deficiencies and issues previously identified." Doc. 82 at 1. But the November Order analyzed the FAC, a superseded pleading. The operative TAC added concrete allegations responsive to the November Order's stated concerns — among them a specific employment inquiry rebuffed for want of accommodation, Doc. 78-1 at 12, and expanded allegations of unavoidable cash-only obligations, Doc. 78-1 at 13–22 — and none of that new matter received analysis. A dismissal with prejudice that never engages the operative complaint's new allegations is not a merits adjudication of that complaint; it is the default rationale wearing different clothing. Finally, because irreparable-injury principles treat even brief deprivations of religious-liberty rights as weighty, see *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), the consequence of error here — permanent foreclosure of federal religious-liberty claims — counsels particular care before affirming a judgment entered, in the first instance, on a missed deadline.

**IV. The shotgun-pleading characterization and the futility ruling cannot sustain a with-prejudice dismissal of the claims pressed on this appeal.**

The Final Order alternatively branded the TAC "an impermissible shotgun pleading." Doc. 82 at 2. The "unifying characteristic" of shotgun pleadings is that they fail "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. Whatever the TAC's imperfections of length and form, its core claims did not fail that test in fact: the Government's motion identified, briefed, and joined issue on the RFRA, Free Exercise, Establishment Clause, and Takings theories with precision, Doc. 81 at 5–11, and the court adjudicated them. A pleading that its adversary answers point by point has given notice; form defects that impede nothing are grounds for repleading instructions, not for extinction of federal claims with prejudice. Cf. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295–96 (11th Cir. 2018) (contemplating repleading as the ordinary response).

Context matters as well. The TAC's excesses were the artifact of a whipsaw no pro se litigant could easily navigate: the FAC was dismissed as insufficiently "specific," with speculative and thin allegations, Doc. 71 at 6–7, 15; the intermediate amended complaint containing Appellant's most developed allegations was barred, Doc. 71 at 14–15; and the TAC — drafted to satisfy a directive to make "specific allegations . . . in full compliance with the applicable case law," Doc. 71 at 15 — was then faulted for saying too much. Appellant does not defend everything in that document. He has narrowed this appeal deliberately:

he abandons the Takings count, the miscellaneous counts the November Order found "not rooted in any actual law," Doc. 71 at 13, the class-certification request, and the declaratory request criticized at Doc. 82 at 2 n.2. What remains — the RFRA claim, the Religion Clause claims, and the Eighth and Fifth Amendment bail claims — is the disciplined pleading the district court asked for.

The deeper error is one of statutory architecture. Congress built RFRA so that the claimant's threshold showing is modest and the demanding work falls on the Government: a claimant shows that government action substantially burdens his sincere religious exercise, and the statute then requires the Government to "demonstrate[]" that the burden is the least restrictive means of furthering a compelling interest — with "demonstrates" defined to mean bearing "the burdens of going forward with the evidence and of persuasion." 42 U.S.C. §§ 2000bb-1(a)–(b), 2000bb-2(3). Pleading that threshold showing is governed by Rule 8's plausibility standard, which requires no "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and which courts may not heighten by decision, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) — and a pro se pleading is "to be liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). The proceedings below ran each of these principles in reverse. Across four complaints,

34

more than a year of motion practice, and an operative pleading that runs to eighty pages and incorporates by reference the 199-page Second Amended Complaint — some 280 pages of allegations in all — Appellant was required to anticipate and refute every conceivable workaround to his own religious practice — a demonstration burden the statute assigns to no claimant — while the Government was never once put to the proof Congress assigned it. *Holt* itself began as a prisoner's pro se complaint. See 574 U.S. at 355–58 (recounting procedural history). A statute whose protections were accessible to a handwritten filing from a prison cell cannot lawfully be administered so that an adherent must produce hundreds of pages, and endure serial dismissals, before any court weighs the Government's justification at all. The escalating demands below did not test Appellant's claim against the law's standard; they substituted a standard of the court's own — and the length those demands produced then became the ground for extinguishing the claim.

The with-prejudice dismissal of the newly named official-capacity defendants for want of service was likewise error — or, at the very most, could have supported dismissal without prejudice as to them. Rule 4(m) allows ninety days from the filing of the complaint to complete service, and it prescribes the remedies for failure: dismissal *without* prejudice, or an order that service be made within a specified time. Fed. R. Civ. P. 4(m); see *Betty K*, 432 F.3d at 1339–40

(identifying Rule 4(m)'s without-prejudice dismissal as the prescribed lesser sanction). The Final Order issued on February 10, 2026 — before the ninety-day period measured from the TAC's filing had run — yet it swept the unserved defendants into a dismissal with prejudice. Doc. 82 at 2–3. A with-prejudice dismissal for non-service, entered before the service period had even expired, against a pro se litigant proceeding by mail, inverts the Rule. See Doc. 82 at 2–3.

The joinder of those officials was, moreover, substantively proper. The Attorney General administers the federal bail system and is the natural officer through whom the August 25, 2025 executive actions pressuring jurisdictions toward cash-only bail operate; the other named officials bear responsibility for additional instruments — such as the United States passport — that the Government prints bearing the Name and that Appellant must carry. Doc. 78-1 at 68–70; Doc. 71 at 14. Official-capacity claims for prospective relief against subordinate executive officers present none of the immunity concerns the November Order invoked in denying joinder. Doc. 71 at 14. Appellant acknowledges that injunctive relief running against the President personally presents distinct and more difficult questions; but those questions supply no basis for refusing joinder of the Attorney General and the other subordinate officials, against whom complete prospective relief can be framed, and the President's

amenability can be addressed by the district court in the first instance on remand. See Fed. R. Civ. P. 19, 21.

For that same reason, the futility ruling — reviewed de novo — fails. An amendment is futile only if the amended complaint would still be properly dismissed; Parts I and II demonstrate that a complaint confined to the claims pressed here states at least a plausible RFRA claim under the correct standards. Where a more carefully drafted complaint might state a claim, this Court's precedent entitles a plaintiff to an opportunity to file it before his action is dismissed with prejudice. See *Bryant*, 252 F.3d at 1163; *Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend "shall be freely given when justice so requires"). Appellant respectfully submits that the just disposition is a remand at which he may file a conforming amended complaint limited to the claims identified above — and at which, for the first time in this litigation, his claims can be heard on a record rather than extinguished at the threshold.

Finally, Appellant respectfully asks this Court to state expressly what its disposition will imply: that the claims pressed on this appeal are not frivolous. A claim is frivolous only if it "lacks an arguable basis either in law or in fact," and a complaint's failure to state a claim — even were that conclusion correct here — does not make it frivolous. *Neitzke v. Williams*, 490 U.S. 319, 325, 328 (1989). A RFRA claim presenting a question of first impression in this Circuit has an

arguable basis in law by definition. Yet "frivolous" has become a fixture of this litigation: the Government moved to have Appellant declared a vexatious litigant, Doc. 14, renewed the characterization in successive filings, e.g., Doc. 59 at 7, and the district court adopted the vocabulary, branding Appellant's entrenchment argument "simply frivolous." Doc. 79 at 4. An express determination by this Court — which will in any event bind as the law of the case on remand — will spare the parties and the district court another round of litigation over the arguable basis of claims this Court has sustained, and will let the remand proceed to the questions RFRA actually asks.

That determination would also align this case with where the governing body of law now stands. Few subjects have occupied more of the Supreme Court's recent docket than religious liberty, and the through-line of its RFRA and RLUIPA jurisprudence — much of it unanimous — is the protection of minority and unfamiliar belief: the small American branch of a Brazilian faith in *Gonzales v. O Centro*, 546 U.S. 418 (2006) (unanimous); the Muslim prisoner whose grooming claim prevailed in *Holt v. Hobbs*, 574 U.S. 352 (2015) (unanimous); the Muslim men placed on the No Fly List for declining to inform on their co-religionists, for whom the Court unanimously recognized a damages remedy against federal officials under RFRA in *Tanzin v. Tanvir*, 592 U.S. 43 (2020); and, in 2025, the religious entity unanimously vindicated against a denominationally selective

exemption in *Catholic Charities*, 605 U.S. 238. These statutes were not written for majoritarian creeds, which rarely need them; they were written for claimants whose practice sits at the margin of public familiarity — including, as *Thomas* and *Frazee* hold, positions that a claimant's own co-religionists do not share. A statute whose office is the protection of unfamiliar belief cannot faithfully be administered by dismissing unfamiliar belief, unheard, as "trivial" or "frivolous" at the pleadings.

Nor does this appeal ask the federal courts to disturb a Founding-era inheritance. The Framers' motto was *E Pluribus Unum*, borne on the Great Seal since 1782; the current formulation first reached the coinage amid the Civil War, in 1864, and became the national motto only in 1956. See 36 U.S.C. § 302. And when the question last commanded a President's personal attention in the design process, President Theodore Roosevelt opposed placing the Name on the 1907 coinage as an irreverence that cheapened it — the very concern, millennia older in Tractate Rosh Hashanah 18b, that Appellant presses here. Doc. 78-1 at 56, 70; Doc. 35-1 at 51, 53–54, 56, 86–93 (proposed second amended complaint, denied as futile, Doc. 71). Appellant's position is not an assault on historic Americana; it is an appeal to its older stratum, and to the Framers' own choice.

A closing word on posture. The question at the core of this appeal bears the features of one destined for ultimate resolution beyond this Court: it is open in this

Circuit; the out-of-circuit decisions addressing cognate claims rest on reasoning

that, as Part I.D shows, cannot be reconciled with *Holt*; the subject — the design of

the Nation's exclusive legal tender — is inherently national and cannot remain

answered differently in different circuits; and the opposing party in every such case

is the United States. Whichever party ultimately prevails on the merits, further

review is foreseeable — and Appellant states plainly that, for himself and for his

children, he will seek it if he must. What that prospect asks of this Court is not a

particular outcome but a worthy record: a question of this character should reach

any eventual review upon a developed record and a reasoned merits adjudication,

not upon a with-prejudice default under a local rule, entered without a single

hearing on the merits of any motion in the case.

**V. The relief sought is modest, prospective, and administrable.**
**A. The relief is narrow, forward-looking, and administrable.**

A final word on remedy, because the specter of upheaval did work below

that the pleadings do not support. Appellant has never sought recall of circulating

currency, and the operative complaint expressly identifies a minimum-cost

accommodation confined to new designs adopted in the ordinary plate-replacement

cycle. Doc. 78-1 at 24–25, 33. What RFRA compels, if Appellant prevails, is

narrow and forward-looking only: that the Government cease inscribing on newly

issued currency — regular and commemorative designs alike — any fully spelled

rendering of the Name that Jewish tradition holds too sacred for ordinary printing,

including the English rendering at issue here, and adopt instead a non-custodial formulation. Appellant has proposed the contiguous alteration "In G We Trust"; the choice among compliant alternatives belongs to Congress and the Treasury.

On timing, Appellant has urged that a full transition be accomplished within the span it took the Nation to progress from President Kennedy's lunar commitment to the Apollo landing. But he acknowledges that the pace of replacing currency already in circulation is committed to remedial discretion: a court may permit the Treasury to proceed as gradually as its ordinary redesign cycles allow — as the courts permitted for the accessibility remedy that followed *American Council of the Blind v. Paulson* — so long as every new printing and every new design going forward complies. And to be explicit: Appellant hopes the Government will treat compliance as the occasion for the deeper, long-overdue redesign of American currency he has advocated, but he does not contend, and has never contended, that any such overhaul is legally compulsory. The only compulsory step is the cessation of new sacred-Name printings. Nothing about relief of that shape justified resolving this case on a webpage's cost figure, at the pleading stage, with prejudice, by default. Appellant asks only for what he has never yet received: adjudication.

**B. Relief ordered now is the only relief that can arrive in time for the next generation — and the district court's derision of Appellant's intergenerational religious allegations repeats the errors that pervade the judgment.**

Appellant's standing rests on his own injuries — a completed twenty-eight-day incarceration, exclusion from employment and commerce, and the ongoing custodial burdens his faith imposes. Doc. 78-1 at 12–22; Doc. 71 at 4–5. But the *timing* of relief is governed by facts the district court never engaged: currency reform is an extraordinarily high-inertia undertaking. The court itself observed that the annual operating budget for new currency alone exceeds one billion dollars, Doc. 71 at 8, and the operative complaint pleaded that even the minimum-cost transition — conforming new designs adopted in the ordinary plate-replacement cycle — takes years to begin and a decade or more to reach full circulation. Doc. 78-1 at 25, 39–40, 45–46.

The lead time has generational consequences, and Appellant pleaded them with specificity. He pleaded a concrete commitment to parenthood on a defined timeline — through marriage, adoption, or foster placement, and by adoption alone if necessary — supported by years of documented preparation, including a child's name selected and maintained on a naming list kept since May 2020. Doc. 78-1 at 37–39. He pleaded that under his religious tradition his custodial duties toward the Divine Name are present obligations that will bind his household and descend to his children from their first day in his care. Doc. 78-1 at 38. He pleaded, as sincere Kabbalistic belief grounded in the doctrine of *Gilgulim* elaborated in the *Zohar* and in Rabbi Chaim Vital's *Sha'ar HaGilgulim* — a doctrine embraced by Hasidic,

Sephardic, and significant Orthodox communities — a religious duty of care running to the soul's future embodiment. Doc. 78-1 at 41–42. And he backed these pleaded obligations with resources, directing his estate counsel to earmark $100,000, contingently, to protect the legal interests of his future children and reincarnates should he die before this controversy is resolved. Doc. 78-1 at 46, 78–79. These were not ramblings; they were pleaded religious obligations, submitted in direct response to the November Order's demand for specific allegations. Doc. 71 at 14–15.

*First*, the pleadings establish why prospective relief ordered now is the only relief that can ever arrive in time. A child who enters Appellant's custody in the next several years will spend childhood inside whatever currency system then exists. On that child's first day in Appellant's care, Appellant could file the identical claim as the child's next friend; nothing in the intervening years will change the legal question — only the number of childhoods spent waiting on its answer. The bell of a childhood under religiously incompatible legal tender cannot be unrung. Doc. 78-1 at 40. Where the claimant before the court has standing in his own right and the relief sought is wholly prospective, the foreseeable protection of those who follow him is a reason to adjudicate promptly — not a reason to withhold adjudication. Cf. *Susan B. Anthony List*, 573 U.S. at 158.

*Second*, the district court's treatment of these allegations exemplifies the error that pervades the judgment. Rule 12(b)(6) afforded Appellant no evidentiary hearing at which his seriousness could be tested; its sole safeguard is the command that well-pleaded facts be accepted as true. The court instead labeled the pleaded parental commitment "speculative," Doc. 71 at 6, declined to engage the *Gilgulim* allegations at all, and the Government derided the subject as "ramblings." Doc. 81 at 12. A court may reject a standing theory as a matter of Article III law; that is ordinary judging, and this Court need not resolve any question of third-party or intergenerational standing to decide this appeal. What the court below could not properly do is treat the sincerity and seriousness of the underlying religious framework as unworthy of engagement — for "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714. That dismissive register is of a piece with the order's grading of Appellant's practices as "rather trivial" and "possibly wholly singular," Doc. 71 at 6, 11–12 — the same judicial second-guessing of religious significance that *Hobby Lobby* and *Holt* forbid. See 573 U.S. at 724; 574 U.S. at 361–62. On remand, the intergenerational dimension of Appellant's religious exercise should be received as what RFRA requires: a sincere exercise of religion whose burdens the Government, not the believer, must justify

— and the evidentiary hearing Appellant requests, not another round of pleading-stage skepticism, is the proper forum for testing it.

The history of preliminary relief below confirms both the urgency and the error. Appellant moved on October 6, 2025 to enjoin new religiously problematic currency designs. Doc. 51. The motion sat undecided for ninety-four days, during which the quarter-millennial coins bearing the Name entered circulation on January 5, 2026 — the operative complaint chronicles the harm materializing in real time while the motion waited. Doc. 78-1 at 31–34. When the court ruled, it denied relief without a hearing by incorporating the November Order — "much of the Court's prior analysis in . . . [DE 71] still applies," Doc. 79 at 3 — and pronounced Appellant's entrenchment concern "frivolous" on the premise that relief would require existing currency to be "recalled or somehow rehauled," Doc. 79 at 4 — the same mischaracterization of Appellant's prospective-only request addressed above. Because each design cycle that closes forecloses relief as to that issuance forever, Appellant respectfully requests that, upon reversal, the mandate direct the district court to adjudicate promptly any renewed motion for preliminary relief under the correct legal standards — the record places the next redesign, of the $10 note, at the end of 2026. Doc. 78-1 at 34.

The tempo of this litigation is itself instructive. The core of Appellant's substantial-burden case has been before the district court since the First Amended

Complaint — the November Order analyzed it, Doc. 71 at 4–7 — and each successive pleading responded to the court's stated concerns rather than changing theories. Doc. 78-1 at 2. Yet in more than a year of motion practice the case has never once been heard: Appellant requested an expedited hearing on the face of the operative complaint, Doc. 78-1 at 1, requested a hearing on preliminary relief, Doc. 63 at 1, and was told "no hearing is necessary." Doc. 79 at 5. The litigation has meanwhile outlasted the tenures of five of the officer-defendants named in it — the Certificate of Interested Persons above records five automatic substitutions under Fed. R. App. P. 43(c)(2) — while Appellant's exclusion from the Nation's only legal tender has continued without interruption or substitute. An hour of oral engagement at any point could have corrected the misapprehensions this brief catalogs: that the relief sought was recall rather than prospective conformity, that the abstention was voluntary rather than commanded, that the burdens were trivial rather than incarcerating. Officers come and go by operation of rule; the injury persists by operation of statute. Appellant respectfully submits that the pending motion for expedited treatment should be granted, and that on remand this case should receive at the threshold what more than a year of paper practice never afforded it: a hearing.

**VI. The denial of Appellant's requested accommodation for court filings bearing the Divine Name merged into the judgment and rests on the same legal errors.**
**A. Background and reviewability.**

This litigation did not merely concern Appellant's custodial duties; it generated new objects of them. Pro se litigants are denied electronic filing in the Southern District of Florida, so every submission in this case was printed, mailed, and served on paper, and certain filings — principally the religious source texts Appellant was required to submit to plead his claims intelligibly — necessarily bore the Divine Name. Doc. 40 at 1–3. When the Clerk's office advised Appellant that paper filings are retained for approximately one year and then shredded, Doc. 40 at 4, he moved for a modest, largely self-funded accommodation: advance written notice before destruction; an opportunity to retrieve the identified pages at his own expense at the case's end; and, for any Government copies containing privileged work product, a certification of respectful disposition. Doc. 40 at 4–5; Doc. 48 at 10. He identified the affected pages docket entry by docket entry, to spare the Clerk and the Government any search. Doc. 40 at 3–4; Doc. 48 at 19–20. The court denied the motion and the accompanying hearing request, Doc. 49, and denied reconsideration. Doc. 72. Those orders, interlocutory when entered, merged into the final judgment: "the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment." *Barfield v. Brierton*, 883 F.2d 923, 930 (11th Cir. 1989).

The controversy is live. Final judgment has entered, and under the retention practice described to Appellant the destruction clock on the paper record is

running. Unless corrected, the denial will be consummated in precisely the injury

RFRA exists to prevent — the routine, avoidable destruction of media that

Appellant's faith charges him to protect — after which no relief will be possible.

**B. The ruling that RFRA "does not apply" inverted the statute's text.**

The court's principal holding was that RFRA — which "applies to all

Federal law, and the implementation of that law" — "does not apply in this context

where Plaintiff wishes for the Government, and possibly the Court, to change its

usual practices in this litigation." Doc. 49 at 2 (citing 42 U.S.C. § 2000bb-3). That

reasoning reads a provision defining the statute's universal reach as a limitation

upon it. Section 2000bb-3(a) provides that RFRA "applies to all Federal law, and

the implementation of that law, whether statutory or otherwise." Section 2000bb-1

forbids the "Government" to substantially burden religious exercise except on

strict-scrutiny terms, and § 2000bb-2(1) defines "government" to include "a

branch, department, agency, instrumentality, and official (or other person acting

under color of law) of the United States." The records-retention and destruction

practices of a federal clerk's office, and the document-handling practices of the

Department of Justice — whose counsel held the very copies at issue — are the

implementation of federal law by branches and officials of the United States. And

the premise that "usual practices" lie beyond RFRA's reach inverts the statute's

office: RFRA exists precisely to require case-specific exceptions to generally

applicable federal practice where religious exercise is substantially burdened and

the Government cannot carry its burden "to the person" concerned. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006).

**C. The alternative Establishment Clause holding conflates accommodation with endorsement.**

The order held in the alternative that the requested relief "would clearly infringe on the Establishment Clause as it would result in the Court 'officially prefer[ring]' one religious denomination over another." Doc. 49 at 2 (quoting *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247–48 (2025), in turn quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). That is the precise conflation the Supreme Court rejected in *Cutter v. Wilkinson*: "[t]his Court has long recognized that the government may . . . accommodate religious practices . . . without violating the Establishment Clause," because "there is room for play in the joints" between the Religion Clauses. 544 U.S. 709, 713–14 (2005) (internal quotation marks omitted); accord *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334–35 (1987). The authorities the order invoked concern denominational preference — official favoritism among sects. A notice-before-destruction and retrieval procedure, available on identical terms to any litigant of any faith whose sacred texts enter a court record, prefers no denomination; it is the ordinary machinery of religious accommodation, of a piece with the statutory solicitude federal law already extends to the flag, 4 U.S.C. § 8, and to Native American sacred objects, 25 U.S.C. § 3001

et seq. Indeed, *Catholic Charities* itself unanimously vindicated a religious claimant against a denominationally non-neutral denial of exemption; it is authority for accommodation, not against it.

What remains of the order is commentary: that it was "somewhat confusing and contradictory" for Appellant to claim a burden arising from filings he himself made. Doc. 49 at 2. But the dilemma was government-made. The district's rules deny pro se litigants electronic filing and compel printed submission and service; the pleading standards enforced against Appellant required the religious source texts; and RFRA forbids putting an adherent to a choice between access to a federal forum and fidelity to his faith. See *Hobby Lobby*, 573 U.S. at 720–26. Nor did the Government identify — much less demonstrate — a compelling interest in shredding these particular pages rather than releasing them; administrative convenience, the only interest conceivably at stake, is not one, and RFRA requires the interest to be established as to "the person" burdened. *O Centro*, 546 U.S. at 430–31. The order's evident skepticism toward the coherence of the obligation itself — like the "rather trivial," "possibly wholly singular," and "simply frivolous" appraisals addressed in Parts I and IV — pronounces on the logic of a believer's obligations rather than their sincerity, though "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714.

**D. The Court should direct modest relief on remand.**

Appellant does not ask this Court to administer the accommodation; he asks that the remand carry it. The Court should direct the district court to reconsider the request under the correct legal standards or, more simply, to enter the modest procedure requested below: reasonable advance notice before destruction of the identified paper filings; an opportunity for Appellant to retrieve them, or receive them by mail, at his own expense; and, for any copies withheld as privileged, a certification of respectful disposition. In the interim, Appellant respectfully requests that this Court direct that the identified physical filings be preserved pending final disposition of this appeal and the proceedings on remand. Nothing in that procedure requires any officer of the Government or of the courts to affirm any article of Appellant's faith; it is notice, retrieval, and a receipt.

**CONCLUSION**

For the foregoing reasons, this Court should vacate the judgment of February 10, 2026, reverse the dismissal of Appellant's RFRA, Free Exercise Clause, Establishment Clause, Eighth Amendment, and Fifth Amendment claims, and remand for further proceedings — including leave to file a conforming amended complaint limited to those claims, resolution on a proper footing of the joinder and service of the official-capacity defendants, prompt adjudication of any renewed motion for preliminary relief under the correct legal standards, consideration under Fed. R. Civ. P. 5(d)(3)(B)(i) of leave for Appellant to file

electronically, reconsideration under the correct legal standards — with the identified physical filings preserved in the interim — of Appellant's requested accommodation concerning the disposition of paper filings bearing the Divine Name, and an evidentiary hearing on substantial burden and, if reached, strict scrutiny. Appellant further requests that this Court state expressly that the claims pressed on this appeal are not frivolous, so that the question is settled as the law of the case and the remand may proceed to the merits rather than to renewed litigation over their arguable basis. In the alternative, at minimum, this Court should vacate the with-prejudice designation and remand with instructions to permit such an amended complaint.

In either event, Appellant respectfully requests that the Court direct reassignment to a different judicial officer on remand. Reassignment requires no finding of actual bias; this Court considers whether the original judge would have difficulty putting previously expressed views out of mind, whether reassignment is advisable to preserve the appearance of justice, and whether reassignment would entail waste or duplication out of proportion to the gain. *United States v. Torkington,* 874 F.2d 1441, 1447 (11th Cir. 1989). Each consideration favors reassignment here. No hearing on the merits of any motion was ever held below — the sole proceeding in the entire case was a thirteen-minute status conference, held by videoconference on August 21, 2025 to address consent to magistrate-judge

jurisdiction, months before the first dispositive ruling, Doc. 28 — and every dispositive assessment was made on the papers. Across those rulings the court pronounced Appellant's pleaded religious obligations "rather trivial," his practice "possibly wholly singular," and his entrenchment concern "simply frivolous," Doc. 71 at 6, 11–12; Doc. 79 at 4, before resolving the case with prejudice "by default." Doc. 82 at 1. Those are appraisals of the worth of the religious exercise itself — the subject on which *Thomas*, *Hobby Lobby*, and *Holt* require judicial restraint — and, having been expressed as settled conclusions across three rulings, they are not the kind of views readily put aside. Because this case never proceeded past the pleadings, reassignment entails no duplication of discovery or factfinding. Appellant notes further that this action proceeds on the parties' consent under 28 U.S.C. § 636(c), and that § 636(c)(4) independently permits the reference to be vacated in extraordinary circumstances on remand; a direction from this Court would resolve the question more simply and completely.

Respectfully submitted,

/s/ David Morris Clayman
David Morris Clayman, Pro Se Plaintiff–Appellant
7930 Palacio Del Mar Drive, Boca Raton, FL 33433-4148
+1 (321) 252-9626 | david@clayman.org

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 11th Cir. R. 32-4 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 12,839 words. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using DOCX Word format and Google Documents in 14-point Times New Roman font.

/s/ David Morris Clayman

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of July, 2026, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court using the CM/ECF system, which will send a Notice of Docket Activity constituting service upon all counsel of record registered to use the ECF system, including counsel for Defendants–Appellees, George Doty III, Assistant United States Attorney, United States Attorney's Office for the Southern District of Florida, 99 NE 4th Street, Miami, Florida 33132, George.Doty@usdoj.gov.

/s/ David Morris Clayman